# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRANNON SKILLERN, RYAN CORKEN, MICHAEL LITVIN, and KATHY LITVIN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> PELOTON INTERACTIVE, INC., <br><br> Defendant. | Case No. 21-cv-6808-ER |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL ARBITRATION AND TO DISMISS PLAINTIFFS' CLAIMS

Jean A. Pawlow (admitted *pro hac vice*)
Michael E. Bern (admitted *pro hac vice*)
Gregory B. in den Berken (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Phone:   (202) 637-2200
Fax:      (202) 637-2201
Email:   jean.pawlow@lw.com
            michael.bern@lw.com
            greg.indenberken@lw.com

Steven N. Feldman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Phone:   (212) 906-1200
Fax:      (212) 751-4864
Email:   steve.feldman@lw.com

William J. Trach (admitted *pro hac vice*)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Phone:   (617) 948-6000
Fax:      (617) 948-6001
Email:   william.trach@lw.com

*Counsel for Defendant Peloton Interactive, Inc.*

January 11, 2022

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT OF ALLEGED FACTS ....................................................................3

I.     The Peloton Terms Of Service............................................................3

II.    Each Peloton Subscriber Charged With Sales Tax In This Case Agreed To Peloton's Terms Of Service ..........................................................6

III.   Plaintiffs' First Amended Complaint ...................................................8

ARGUMENT .......................................................................................................10

I.     PLAINTIFFS MUST ARBITRATE THEIR CLAIMS ........................11

     A.    Ms. Skillern And The Litvins Must Arbitrate Their Claims.....................11

          1.    The Parties Entered Into A Valid Agreement To Arbitrate ..........12

          2.    Plaintiffs' Claims Fall Within The Scope Of The Arbitration Agreement And The Arbitrator Must Resolve Any Contrary Argument .........................................................................16

     B.    Mr. Corken Is Likewise Required To Arbitrate His Claim .......................18

     C.    Because All Of Plaintiffs' Claims Are Subject To Arbitration, This Court Should Dismiss The Complaint .......................................22

II.    ALTERNATIVELY, THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS ........................................................................................23

     A.    Because Peloton Members Waive The Right To Bring A Class Action, This Court Cannot And Should Not Exercise Federal Jurisdiction .................................................................23

     B.    Plaintiffs Also Fail To State Claims On Which Relief Can Be Granted .........................................................................26

          1.    The Tax Injunction Act And Related Comity Doctrine Bar Plaintiffs' Claims ...............................................................26

          2.    Plaintiffs' New York Claims Should Be Dismissed For Failure To Exhaust Administrative Remedies ...............................28

3.      Plaintiffs' Massachusetts Claim Must Be Dismissed For Failure To Exhaust Administrative Remedies And Failure To State A Claim ........................................................................31

    a.      Plaintiffs Have Not Alleged That They Filed Claims For Refunds In Massachusetts ...........................................31

    b.      Plaintiffs Have Not Stated An Actionable Claim Under Massachusetts's Consumer Protection Law............32

4.      Plaintiffs' Virginia Claims Should Be Dismissed For Failure To Notify Peloton Before Bringing Suit.........................................34

CONCLUSION..................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*,
  307 F.3d 24 (2d Cir. 2002)........................................................................17

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
  170 F.3d 349 (2d Cir. 1999).....................................................................20

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
  672 F.3d 113 (2d Cir. 2011)...............................................................12, 17

*Arciniaga v. Gen. Motors Corp.*,
  460 F.3d 231 (2d Cir. 2006)......................................................................12

*Arrigo v. Blue Fish Commodities, Inc.*,
  704 F. Supp. 2d 299 (S.D.N.Y. 2010).......................................................23

*Atkinson v. Rosenthal*,
  598 N.E.2d 666 (Mass. App. Ct. 1992) .....................................................33

*Bell v. Cendant Corp.*,
  293 F.3d 563 (2d Cir. 2002)......................................................................23

*Bensadoun v. Jobe-Riat*,
  316 F.3d 171 (2d Cir. 2003)......................................................................12

*Bernard v. Village of Spring Valley*,
  30 F.3d 294 (2d Cir. 1994)........................................................................26

*Borsack v. Chalk & Vermilion Fine Arts, Ltd.*,
  974 F. Supp. 293 (S.D.N.Y. 1997)............................................................21

*Camilo v. Uber Techs., Inc.*,
  2018 WL 2464507 (S.D.N.Y. May 31, 2018) ...........................................24

*Carnegie-Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988)............................................................................25, 26

*Cohen v. Avanade, Inc.*,
  874 F. Supp. 2d 315 (S.D.N.Y. 2012)........................................................24

*Cohen v. Hertz Corp.*,
  2013 WL 9450421 (S.D.N.Y. Nov. 26, 2013)............................................29

*Cohen v. Postal Holdings, LLC,*
   873 F.3d 394 (2d Cir. 2017)..........................................................................26

*Contec Corp. v. Remote Sol. Co.,*
   398 F.3d 205 (2d Cir. 2005)..........................................................................18

*Davidson v. Rochester Tel. Corp.,*
   558 N.Y.S.2d 1009 (3d Dep't 1990)............................................................29

*Doctor's Assocs. v. Stuart,*
   85 F.3d 975 (2d Cir. 1996)............................................................................23

*Dorce v. City of New York,*
   2 F.4th 82 (2d Cir. 2021) ..............................................................................27

*Duclersaint v. Fed. Nat. Mortg. Ass'n,*
   696 N.E.2d 536 (Mass. 1998) .......................................................................33

*Epic Sys. Corp. v. Lewis,*
   138 S. Ct. 1612 (2018)..................................................................................11

*Estler v. Dunkin' Brands, Inc.,*
   691 F. App'x 3 (2d Cir. 2017) ......................................................................29

*F5 Capital v. Pappas,*
   856 F.3d 61 (2d Cir. 2017)............................................................................25

*Feeney v. Dell Inc.,*
   908 N.E.2d 753 (Mass. 2009) .......................................................................34

*Fredrickson v. Starbucks Corp.,*
   840 F.3d 1119 (9th Cir. 2016) ......................................................................27

*Freeport-McMoRan, Inc. v. K N Energy, Inc.,*
   498 U.S. 426 (1991)......................................................................................25

*Gen. Dynamics Corp. v. Bd. of Assessors of Quincy,*
   444 N.E.2d 1266 (Mass. 1983) .....................................................................32

*Gilbert v. Home Depot,*
   2014 WL 4923107 (W.D.N.Y. Sept. 30, 2014) ...........................................29

*Gold v. N.Y. Life Ins.,*
   141 N.Y.S.3d 697 (1st Dep't 2021) ..............................................................24

*Guterman v. Costco Wholesale Corp.,*
   927 F.3d 67 (2d Cir. 2019)............................................................................29

*Guyden v. Aetna, Inc.*,
    544 F.3d 376 (2d Cir. 2008)................................................................17

*Gwozdz v. HealthPort Techs., LLC*,
    846 F.3d 738 (4th Cir. 2017) .............................................................27

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
    139 S. Ct. 524 (2019).........................................................................18

*Horton v. Dow Jones & Co.*,
    2019 WL 952314 (S.D.N.Y. Feb. 27, 2019)...................................24, 25

*Jefferies & Co. v. Infinity Equities I, LLC*,
    887 N.Y.S.2d 81 (1st Dep't 2009) .....................................................20

*Joseph v. Hyman*,
    659 F.3d 215 (2d Cir. 2011)...............................................................26

*Juarez v. Select Portfolio Servicing, Inc.*,
    708 F.3d 269 (1st Cir. 2013)..............................................................33

*Kolari v. New York-Presbyterian Hosp.*,
    455 F.3d 118 (2d Cir. 2006)...............................................................26

*Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*,
    32 F.2d 195 ........................................................................................19

*Kupferstein v. TJX Cos.*,
    2017 WL 590324 (E.D.N.Y. Feb. 14, 2017)..........................29, 30, 34

*Lankford v. Orkin Exterminating Co.*,
    597 S.E.2d 470 (Ga. Ct. App. 2004)..................................................22

*Leger v. Adams*,
    1994 WL 879587 (Mass. Super. Ct. July 15, 1994) ...........................32

*Levin v. Com. Energy, Inc.*,
    560 U.S. 413 (2010)...........................................................................26

*Louis v. Comm'r of Soc. Sec.*,
    2010 WL 743939 (S.D.N.Y. Mar. 2, 2010) .......................................28

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)...............................................................28

*McGonagle v. Home Depot U.S.A., Inc.*,
    915 N.E.2d 1083 (Mass. 2009) .........................................................32

*McLean v. Big Lots Inc.*,
  2021 WL 2317417 (W.D. Pa. June 7, 2021)........................................................33

*Mobile Real Estate, LLC v. NewPoint Media Grp., LLC*,
  460 F. Supp. 3d 457 (S.D.N.Y. 2020)..............................................................21

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983).........................................................................................11, 17

*Nechis v. Oxford Health Plans, Inc.*,
  421 F.3d 96 (2nd Cir. 2005)..............................................................................24

*Nicosia v. Amazon.com, Inc.*,
  384 F. Supp. 3d 254 (E.D.N.Y. 2019) ............................................................21, 22

*Nicosia v. Amazon.com, Inc.*,
  834 F.3d 220 (2d Cir. 2016)..............................................................................12

*NPS Commc'ns, Inc. v. Cont'l Grp.*,
  760 F.2d 463 (2d Cir. 1985)..............................................................................22

*O'Callaghan v. Uber Corp. of Cal.*,
  2018 WL 3302179 (S.D.N.Y. July 5, 2018) ......................................................13

*Poindexter v. EMI Rec. Grp. Inc.*,
  2012 WL 1027639 (S.D.N.Y. Mar. 27, 2012) ..................................................19

*Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  7 F.3d 1110 (3d Cir. 1993)................................................................................22

*Ralph Lauren Corp. v. U.S. Polo Ass'n*,
  2014 WL 4377852 (S.D.N.Y. Sept. 4, 2014)....................................................12

*Ranieri v. Bell Atl. Mobile*,
  759 N.Y.S.2d 448 (1st Dep't 2003) ..................................................................24

*Raymond v. Mid-Bronx Haulage Corp.*,
  2017 WL 9882601 (S.D.N.Y. June 10, 2017) ..................................................15

*Republic of Ecuador v. Chevron Corp.*,
  638 F.3d 384, 400 (2d Cir. 2011)......................................................................21

*Román v. Spirit Airlines*,
  482 F. Supp. 3d 1304 (S.D. Fla. 2020) .............................................................25

*Saizhang Guan v. Uber Techs., Inc.*,
  236 F. Supp. 3d 711 (E.D.N.Y. 2017) ...........................................................15, 16

*Schnabel v. Trilegiant Corp.*,
697 F.3d 110 (2d Cir. 2012)................................................................................11

*Shearson/Am. Exp., Inc. v. McMahon*,
482 U.S. 220 (1987)............................................................................................22

*Smith/Enron Cogeneration Ltd. P'ship, v. Smith Cogeneration Int'l, Inc.*,
198 F.3d 88 (2d Cir. 1999)..................................................................................15

*Spencer-Franklin v. Citigroup/Citibank N.A.*,
2007 WL 521295 (S.D.N.Y. Feb. 21, 2007).......................................................23

*Togut v. Forever 21, Inc.*,
285 F. Supp. 3d 643 (S.D.N.Y. 2018)...........................................................30, 34

*Tsadilas v. Providian Nat'l Bank*,
786 N.Y.S.2d 478 (1st Dep't 2004)....................................................................24

*Valle v. ATM Nat'l, LLC*,
2015 WL 413449 (S.D.N.Y. Jan. 30, 2015) ......................................................15

*Weber v. Quest Diagnostics of Pa., Inc.*,
2020 WL 6372382 (W.D.N.Y. Oct. 29, 2020) ...................................................25

*Whitinsville Plaza, Inc. v. Kotseas*,
390 N.E.2d 243 (Mass. 1979).............................................................................33

*Williams v. Joseph Dillon & Co.*,
663 N.Y.S.2d 126 (2d Dep't 1997).....................................................................15

*Wolff Motor Co. v. White*,
869 So. 2d 1129 (Ala. 2003)...............................................................................22

*Woods v. Wells Fargo Bank, N.A.*,
733 F.3d 349 (1st Cir. 2013)........................................................................33, 34

## STATUTES & RULES

9 U.S.C.
§ 2....................................................................................................................11
§ 3....................................................................................................................22

28 U.S.C.
§ 1332(d)................................................................................................23, 24, 25
§ 1332(d)(2) ......................................................................................................23
§ 1341.......................................................................................................2, 3, 26, 27

Mass. Gen. Laws ch. 62C § 37 ..............................................................................31

Mass. Gen. Laws ch. 93A

  § 2....................................................................................................................31

  § 9....................................................................................................................31

N.Y. Gen. Bus. Law § 349..................................................................................29

N.Y. Tax Law

  § 1139...................................................................................................28, 29, 30

  § 1140..............................................................................................................29

Va. Code Ann.

  § 58.1-648(C)...................................................................................................34

  § 58.1-652.......................................................................................................35

Fed. R. Civ. P.

  12(b)(1).............................................................................................................28

  12(b)(6).............................................................................................................28

## OTHER AUTHORITIES

Peloton Interactive, Inc., Registration Statement (Form S-1) (Aug. 27, 2019),
  https://investor.onepeloton.com/node /6261/html ...................................30

*Peloton Terms of Service*, Peloton,
  https://www.onepeloton.com/terms-of-service (last updated June 21, 2021)........................16

*Streamlined Arbitration Rules & Procedures*, JAMS, https://www.jamsadr.com/rules-
  streamlined-arbitration/#Rule-8 (effective June 1, 2021).......................................18

**INTRODUCTION**

Peloton Interactive, Inc. ("Peloton") is the largest interactive fitness platform in the world with a loyal community of over 6.2 million members.  In this case, four plaintiffs allege that Peloton improperly charged sales tax to Peloton membership subscribers residing in Massachusetts, New York, Oregon, or Virginia.  Plaintiffs assert that in so doing, Peloton breached part of the contract into which it enters with its members (Peloton's Terms of Service) and violated the consumer-protection statutes of the states in which those members live.

Plaintiffs seek to pursue their claims via a class action in federal court.  But Plaintiffs' claims do not belong in federal court for multiple reasons.  To begin with, as Plaintiffs admit, Peloton's Terms of Service specify that any dispute arising from or relating to the Terms of Service, their alleged breach, or the use of Peloton's services must be resolved by individual arbitration.  *See, e.g.*, ECF No. 40 (First Amended Complaint, "FAC") ¶ 32; ECF No. 40-1 § 20.[1] And it is undisputed that Plaintiffs' claims all stem from a dispute arising from or relating to sales tax collected in purported breach of Peloton's Terms of Service.  *See, e.g.*, FAC ¶¶ 5-6, 75-81, 88.

Plaintiffs try to avoid arbitration by alleging that the American Arbitration Association ("AAA")—the entity envisioned to conduct the arbitration under an older, September 14, 2018 version of Peloton's Terms of Service—is unwilling to conduct arbitrations involving Peloton.  *Id.* ¶¶ 32-35.  But Peloton adopted updated Terms of Service on December 27, 2019, which removed AAA and provided instead that JAMS shall conduct such arbitrations.  And Peloton's account records confirm that each Peloton member to whom Peloton charged sales tax in this case ***agreed to those updated Terms***, including the updated arbitration clause, long ago.  Under settled Second

---

[1]   ECF No. 40-1 is a copy of Peloton's September 14, 2018 Terms of Service that Plaintiffs included as an exhibit to their FAC.  That version has long since been superseded by later versions of Peloton's Terms of Service.  *See* Decl. of Daniel Feinberg ("Feinberg Decl.") ¶ 6.

Circuit law and the Terms of Service themselves, Peloton's updated Terms control.  This Court should thus grant Peloton's motion to compel arbitration.

Even if Plaintiffs were not obligated to arbitrate their claims (they are), dismissal would still be necessary.  As the September 2018 version of the Terms of Service attached to the FAC makes clear, Peloton's Terms of Service expressly include a "**CLASS ACTION WAIVER**" specifying that parties to Peloton's Terms of Service may bring claims against Peloton "**ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING**."  ECF No. 40-1 §§ 20, 20(e); *see also* FAC ¶ 77.  Peloton's updated Terms of Service continue to include the same provisions.  *See* Feinberg Decl. Ex. E (Peloton Terms of Service (last updated Dec. 27, 2019)) ("2019 TOS") §§ 20, 20(f).  Courts have repeatedly confirmed that such agreements are enforceable under New York law.  Because Plaintiffs' individual claims cannot support federal jurisdiction, this Court should dismiss the action.

Finally, even if Plaintiffs could somehow overcome their binding agreements to arbitrate and to pursue any action only in an individual capacity, they still would fail to state a claim. Plaintiffs' attempt to recover the payment of a state tax in federal court is barred by the Tax Injunction Act and the related comity doctrine.  And several Plaintiffs did not abide by the process that their state's tax laws mandate as a precondition for filing a lawsuit for an alleged overpayment of tax.  For those reasons, too, Plaintiffs cannot maintain this action in federal court.

This Court should thus grant Peloton's motion to compel arbitration or grant Peloton's motion to dismiss with prejudice.

## STATEMENT OF ALLEGED FACTS

### I.     The Peloton Terms Of Service

Peloton is a cutting-edge fitness platform that helps its members accomplish their exercise goals by enabling them to exercise where and when they want.  *See* FAC ¶¶ 2, 20-21.  With the state-of-the-art Peloton Bike or Peloton Tread, members can access Peloton's catalogue of fitness classes—which are taught by some of the world's best instructors—and stream them live or on-demand on a high-definition screen.  *See id.*  To subscribe to and use Peloton's content and services, members pay a monthly subscription fee.  *Id.* ¶ 4.  Peloton's All-Access Membership costs $39 per month and is available to Peloton Bike and Tread owners, while Peloton's Digital Membership costs $12.99 per month and (through the Peloton App) makes fitness classes available to anyone with a compatible phone, tablet, TV, or computer.  *See id.* ¶¶ 4, 20.  Purchase of a Peloton All-Access Membership provides the Membership Holder and members of his or her household residing at one residential address with access to Peloton's available classes, content, and features while the All-Access Membership remains active.  *See* Feinberg Decl. Ex. I.

Peloton's relationship with its members is governed by its Terms of Service, a binding contract that includes and incorporates Peloton's Membership Terms, warranty, and other policies (together, the "Terms").  *Id.* ¶¶ 5, 29; *see also* ECF No. 40-1 at 1, § 26; 2019 TOS at 1, § 26.  Members' use of Peloton's services through a Peloton membership subscription is expressly conditioned on agreement to and acceptance of the Terms.[2]  Bold, capitalized letters near the top of the Terms inform prospective members that:

---

[2]     *See* ECF No. 40-1 at 1 ("By registering as a member or by visiting, browsing, or using the Peloton Service in any way, you (as a 'user') accept and agree to be bound by these Terms of Service ('Terms'), which forms a binding agreement between you and Peloton."); *id.* ("If you do not wish to be bound by these Terms, you may not access or use the Peloton Service."); *see also* 2019 TOS at 1.

> **THE[] TERMS CONTAIN A BINDING ARBITRATION PROVISION AND CLASS ACTION WAIVER (SECTION 20). READ CAREFULLY, INCLUDING YOUR RIGHT, IF APPLICABLE, TO OPT OUT OF ARBITRATION. EXCEPT FOR CERTAIN TYPES OF DISPUTES DESCRIBED IN SECTION 20 BELOW, OR WHERE PROHIBITED BY LAW, BY ENTERING INTO THESE TERMS YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND PELOTON WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION, AND YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.**

ECF No. 40-1 at 1; 2019 TOS at 1.  The arbitration clause and class-action waiver provisions in Section 20 similarly flag their importance with specialized text providing:  "**ARBITRATION CLAUSE & CLASS ACTION WAIVER – IMPORTANT – PLEASE REVIEW AS THIS MAY AFFECT YOUR LEGAL RIGHTS.  APPLICABLE TO THE FULL EXTENT PERMITTED BY LAW.**"  *Id.* § 20.  Throughout the period relevant to this case, Section 20 has specified that:

- Any dispute, claim, or controversy arising out of or relating to Peloton's Terms of Service, the breach or interpretation thereof, or the use of Peloton's services or content will be resolved "**solely by binding, individual arbitration**."[3]

- The parties may bring claims against each other only in an individual capacity and waive the right to bring or participate in a class action.[4]

---

[3]   *Id.* § 20(a).  Disputes in small-claims court and the pursuit of injunctive relief for certain intellectual-property disputes are excepted, and members "**retain the right to opt out of arbitration entirely and litigate any Dispute**" if they give Peloton written notice within 30 days from the date they first agree to the Terms.  *Id.* § 20(b).  Plaintiffs do not allege that they provided such notice to Peloton upon first agreeing to the Terms.

[4]   *See id.* § 20(a) ("We each agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content (collectively, 'Disputes') will be resolved solely by binding, individual arbitration and not in a class, representative, or consolidated action or proceeding."); *id.* § 20(e) ("**YOU AND PELOTON AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**"); 2019 TOS § 20(f) (same).

4

- The Federal Arbitration Act governs enforcement and interpretation of the Terms.[5]

- "The parties agree that the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of th[e] arbitration agreement."[6]

- If any part of Section 20's terms (other than the class-action waiver provision) is found invalid or unenforceable, the other parts will still apply.[7]

The Terms also specify that Peloton may update them at its discretion, and that Peloton will let members know about updates by (at a minimum) posting them on its website or through the Peloton Service.  ECF No. 40-1 §§ 24-25; 2019 TOS §§ 24-25.  Members agree that use of Peloton's content or services after any update constitutes agreement to be bound by the updated Terms, and that such agreement is required for continued use.  *Id.* § 25.  When making certain updates to its Terms, Peloton also notifies members of the update directly through the Peloton Bike, Tread, or App—and requires members in those instances to specifically accept the amended Terms in order to continue using Peloton's services.  *See* Feinberg Decl. ¶ 9.  Peloton also notifies members of certain updates to its Terms of Service by email.  *See, e.g.*, Decl. of Zulay Olivo ("Olivo Decl.") ¶¶ 6-8.

The September 14, 2018 version of Peloton's Terms of Service attached to Plaintiffs' FAC provided that "[t]he arbitration will be conducted by the American Arbitration Association ('AAA') under its Consumer Arbitration Rules (the 'AAA Rules')."  ECF No. 40-1 § 20(c).  Peloton has updated its Terms of Service several times since September 2018.  Feinberg Decl. ¶ 6.  Beginning with Peloton's December 27, 2019 Terms of Service, Peloton revised the arbitration clause to provide that "[a]ny arbitration will be conducted by JAMS pursuant to its Streamlined Arbitration Rules and Procedures ('JAMS Rules') then in effect, except as modified by these

---

[5]   ECF No. 40-1 § 20(a); 2019 TOS § 20(a).

[6]   ECF No. 40-1 § 20(c); 2019 TOS § 20(d).

[7]   ECF No. 40-1 §§ 20(e), (g), 22; 2019 TOS §§ 20(f), (h), 22.

Terms." *See id.* ¶ 7; 2019 TOS § 20(d).

## II.   Each Peloton Subscriber Charged With Sales Tax In This Case Agreed To Peloton's Terms Of Service

Plaintiffs allege that Peloton improperly charged sales tax to certain Peloton subscribers and collected the tax from the payment method authorized by those subscribers. FAC ¶ 5. Peloton maintains account records in the ordinary course of business with respect to each Peloton member, Feinberg Decl. ¶ 10; *see also* FAC ¶ 68, which confirm that each Peloton subscriber charged with sales tax in this case agreed to Peloton's Terms of Service.

Plaintiff Brannon Skillern alleges that she bought a Peloton Bike in January 2019 while living in New York. FAC ¶¶ 6, 13, 26, 42. Ms. Skillern alleges that she has been an All-Access Membership subscriber since purchasing her Bike, including after moving to Virginia in March 2020. *Id.* Ms. Skillern alleges that Peloton improperly charged sales tax to her account while she was a resident of both New York and Virginia. *Id.* ¶ 42. Peloton's account records confirm that Ms. Skillern agreed to Peloton's October 7, 2018 Terms of Service on January 15, 2019, using the web or a mobile device. Feinberg Decl. ¶ 13 & Ex. F. Ms. Skillern later agreed to Peloton's December 27, 2019 Terms of Service on March 20, 2020, while using the Peloton Bike. *Id.*

Plaintiffs Michael and Kathy Litvin allege that they bought a Peloton Bike in June 2020 while living in Washington. FAC ¶¶ 15, 28. Ms. Litvin alleges that she subscribed to Peloton's All-Access Membership in July 2020. *Id.* She alleges that she paused her Peloton subscription in October 2020, but reactivated it in August 2021 after moving to Oregon. FAC ¶¶ 15, 28. The Litvins allege that Peloton improperly charged sales tax to Ms. Litvin's account after she moved to Oregon. *Id.* ¶¶ 44, 52. Peloton's records establish that Ms. Litvin agreed to Peloton's December 27, 2019 Terms of Service on June 6, 2020, using the web or a mobile device. Feinberg Decl. ¶ 17 & Ex. H.

Mr. Litvin is a Peloton member, but not a Peloton subscriber.  *See* FAC ¶ 28; Feinberg Decl. ¶ 18.  Rather, the Litvins allege that Ms. Litvin "shared her All-Access Membership with Mr. Litvin as a member of the same household," allowing him to access Peloton's services by creating his own Peloton member account under her subscription.  FAC ¶ 28; *see* Feinberg Decl. Ex. I ("An All-Access Membership provides you and members of your household at one residential address (up to 20 user profiles) with full access to Peloton's available classes, content, and features on one Peloton Product from each Peloton Product category.").  Peloton's account records establish that Mr. Litvin agreed to Peloton's December 27, 2019 Terms of Service on July 20, 2020 using the Peloton Bike.  Feinberg Decl. ¶ 18 & Ex. H.

Plaintiff Ryan Corken alleges that he bought a Peloton Bike in December 2019 while living in Massachusetts.  FAC ¶ 14.  He previously alleged that he has "subscribed to Peloton's All-Access Membership" since December 2019 and that he "accepted and agreed to be bound by Peloton's Terms of Service."  ECF No. 1 ¶¶ 6, 13, 25, 67.  In the FAC, however, Mr. Corken instead alleges that *his wife* subscribed to Peloton's All-Access Membership "[o]n or about December 8, 2019" and that he "does not use his wife's Peloton Membership."  FAC ¶ 27.  Mr. Corken alleges that Peloton collected Massachusetts sales tax "on his wife's Peloton membership every month" beginning when "his wife subscribed to the $39/month All-Access Membership in December 2019."  *Id.* ¶ 4.  Mr. Corken alleges that his claim relates to sales tax charged to a Peloton account with the user name "PutACorkenIt."[8]  Pawlow Decl. Ex. A.  Peloton's account

---

[8]    Before Peloton filed its response to Plaintiffs' original complaint, Plaintiffs represented that *Ryan* Corken's Peloton account was registered under the username "PutACorkenIt" with the email address sasha.parr@email.com.  *See* Decl. of Jean Pawlow ¶ 2 & Ex. A.  Plaintiffs now appear to claim that that account is registered to Ryan Corken's wife, Sasha Corken.  *See* FAC ¶ 27.

records confirm that the user of that account agreed to Peloton's October 7, 2018 Terms of Service on December 8, 2019, while using the web or a mobile device.  Feinberg Decl. ¶ 15 & Ex. G.  The account user then agreed to Peloton's December 27, 2019 Terms of Service on December 27, 2019, while using the Peloton Bike.  *Id.*[9]

Plaintiffs admit that the Membership Terms "comprise part of Peloton's Terms of Service," FAC ¶ 5; *see also id.* ¶ 29, and that the Membership Terms constitute a binding, enforceable contract between Peloton and its members, *id.* ¶¶ 29, 78.  They allege that Ms. Skillern, Ms. Litvin, and Ms. Corken continue to subscribe to Peloton's All-Access Membership today.  *Id.* ¶¶ 26-28.

### III.    Plaintiffs' First Amended Complaint

Under the Membership Terms that are included in and comprise part of Peloton's Terms of Service, each Peloton subscriber agrees to pay Peloton a monthly fee plus any applicable taxes and other charges.  *Id.* ¶¶ 4-5, 27-30, 88; *see also* Feinberg Decl. Ex. I.  Peloton's Membership Terms provide that each Peloton subscription holder must provide a payment method that Peloton is authorized to charge each month.  *See* FAC ¶ 31; *see also* Feinberg Decl. Ex. I.  By agreeing to Peloton's Membership Terms, Peloton subscription holders agree that:

> You represent and warrant that *you have the legal right to use all payment method(s) that you provide to us. . . .*  You hereby authorize us to charge your specified payment method on a monthly basis in line with your Membership cycle, in advance, for your Membership(s) . . . .   You authorize the issuer of your selected payment method to pay any amounts described herein without requiring a signed receipt, and you agree that these Membership Terms shall be accepted as authorization to the issuer of the payment method to pay any amounts described herein, without requiring a signed receipt from you.

---

[9]    Peloton's business records also confirm that Peloton emailed notice of the updated terms to the email addresses associated with Skillern's and Corken's accounts.  *See* Olivo Decl. ¶¶ 7-8; *id.* Exs. A & B.  The Litvins did not become Peloton members until months after Peloton emailed notice of the December 2019 Terms to current members.

Feinberg Decl. Ex. I (emphasis added).  Peloton charges sales tax only to subscribers.  *See* FAC ¶¶ 30-31.

Plaintiffs allege that Peloton improperly charged sales tax to three Peloton subscribers—Ms. Skillern, Ms. Litvin, and Ms. Corken—during months in which they resided in either New York, Virginia, Oregon, or Massachusetts.  *Id.* ¶¶ 42-44, 52.  In particular, Ms. Skillern alleges that beginning in January 2019, while living in New York, Peloton charged her $42.47 each month, including $3.47 per month attributable to sales tax.  *Id.* ¶ 42.  Ms. Skillern also alleges that Peloton continued to charge her $3.47 per month in sales tax after she moved to Virginia in April 2020.  *Id.*  The Litvins allege that, from August 2021 through the present, Peloton charged Ms. Litvin $42.28 each month, including $3.28 per month attributable to sales tax.  *Id.* ¶ 44.  Mr. Corken alleges that beginning in December 2019, while living in Massachusetts, Peloton charged Ms. Corken $41.44 each month, including $2.44 per month attributable to sales tax.  *Id.* ¶ 43.

Consistent with Peloton's Membership Terms, each of the Peloton subscribers in this case provided a payment method that was charged each month and authorized Peloton to use that payment method to pay their monthly membership fee and any applicable taxes or other charges.  *Id.* ¶ 5.  Plaintiffs allege that Ms. Litvin has paid for her Peloton membership through Mr. Litvin's credit card.  *Id.* ¶ 28.  Plaintiffs allege that Ms. Corken has paid for her Peloton membership through Mr. Corken's credit or debit card.  *Id.* ¶ 27.  By agreeing to Peloton's Membership Terms, Ms. Litvin and Ms. Corken represented and warranted that *they* had the legal right to use that payment method to make payment on their subscriptions, and authorized Peloton to collect any amounts described in the Membership Terms.  *See id.* ¶ 5; Feinberg Decl. Ex. I.

Plaintiffs allege that at the time Peloton assessed sales tax with respect their subscriptions, no sales tax was actually owed under New York, Virginia, Massachusetts, or Oregon law.  FAC

¶ 55.  Plaintiffs assert that by collecting sales tax on their subscriptions, Peloton breached its Terms of Service.  *Id.* ¶¶ 12, 80.  Plaintiffs further claim that the same conduct violated New York's, Virginia's, Massachusetts's, and Oregon's consumer-protection statutes.  *Id.* ¶¶ 82-134.  Plaintiffs allege that Peloton stopped charging sales tax for New York, Virginia, and Massachusetts subscriptions as of January 1, 2021.  *Id.* ¶ 48.  Plaintiffs allege that Peloton continues to charge sales tax to "certain Oregon consumers" today.  *Id.* ¶ 55.

Despite each Peloton member's agreement to bring claims against Peloton "only in an individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding," ECF No. 40-1 § 20(e) (emphasis and capitalization omitted); Feinberg Decl. Ex. A § 20.6; 2019 TOS § 20(f), as well as their agreement only to bring claims in individual arbitration, ECF No. 40-1 § 20(a); Feinberg Decl. Ex. A § 20.1; 2019 TOS § 20(a), Plaintiffs filed this class action against Peloton, seeking to represent "[a]ll persons or entities residing in Massachusetts, New York, Oregon, and/or Virginia who have paid tax on a Peloton Membership," FAC ¶ 62.

## ARGUMENT

Plaintiffs Skillern and Corken originally filed this case on August 12, 2021, asserting three claims: (1) a breach-of-contract claim; (2) a claim under Virginia's Consumer Protection Act; and (3) a claim under New York's General Business Law.  *See* ECF No. 1 ¶¶ 65-95.  On November 23, 2021, Peloton moved to compel arbitration and to dismiss Plaintiffs' claims.  *See* ECF Nos. 32-36.  In so doing, Peloton submitted three declarations and eleven exhibits, detailed how those submissions establish that Plaintiffs are required to arbitrate their claims, and explained why Plaintiffs' claims fail as a matter of law in any event.  *See* ECF No. 33.

Plaintiffs did not respond to Peloton's motion.  Instead, on December 14, 2021, they filed an amended complaint.  *See* ECF No. 40.  But despite adding new plaintiffs and new claims, the

FAC does nothing to save Plaintiffs' case.  Although Plaintiffs retreat from certain admissions that they made in the original complaint and seek to vary the language of their allegations in a transparent attempt to avoid arbitration, the FAC and undisputed record confirm that Plaintiffs' claims cannot proceed in federal court.

## I.      PLAINTIFFS MUST ARBITRATE THEIR CLAIMS

### A.      Ms. Skillern And The Litvins Must Arbitrate Their Claims

Three of the four Plaintiffs in this case—Ms. Skillern and the Litvins—allege that they "accepted and agreed to be bound by Peloton's Membership Terms when they subscribed to Peloton Membership subscriptions and used their Peloton Bikes, Peloton Treads, and other Peloton products and services."  FAC ¶ 77.  Those terms "comprise part of Peloton's Terms of Service," *id.* ¶ 5, to which Peloton's records likewise confirm Ms. Skillern and the Litvins agreed.  *See supra* at 6-8.  Having agreed to Peloton's Terms of Service, Ms. Skillern and the Litvins agreed that "any dispute, claim or controversy arising out of or relating to these Terms or the breach . . . or validity thereof or the use of [Peloton's] Services or Content . . . will be resolved **solely by binding, individual arbitration**."  ECF No. 40-1 § 20(a); 2019 TOS § 20(a).  Because their claims arise out of the Terms of Service or their alleged breach, this Court should compel Ms. Skillern and the Litvins to arbitrate their claims and dismiss this case with prejudice.

The Federal Arbitration Act ("FAA") provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable."  9 U.S.C. § 2.  This forceful language reflects the "liberal federal policy favoring arbitration agreements."  *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  "[T]his policy is founded on a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes."  *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012).  "[I]t is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy [the Second

Circuit] 'ha[s] often and emphatically applied.'" *Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 234 (2d Cir. 2006) (citation omitted).

In adjudicating a motion to compel arbitration, courts principally examine "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement." *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citation omitted). In deciding such motions to compel, courts apply a "standard similar to that applicable for a motion for summary judgment." *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003) (citation omitted). That standard requires a court to consider not only the complaint, but all relevant evidence submitted by the parties, including affidavits. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016); *see also Ralph Lauren Corp. v. U.S. Polo Ass'n*, 2014 WL 4377852, at *1 (S.D.N.Y. Sept. 4, 2014) (on a motion to compel arbitration, courts are "not limited to . . . the pleadings"). Here, the evidence establishes that Ms. Skillern and the Litvins must arbitrate their claims.

### 1.    The Parties Entered Into A Valid Agreement To Arbitrate

First, the parties entered into a valid agreement to arbitrate here. Peloton's records confirm that Ms. Skillern, Ms. Litvin, and Mr. Litvin all agreed to Peloton's Terms of Service. *See* Feinberg Decl. ¶¶ 13, 17-18 & Exs. F, H. And Plaintiffs admit that Peloton's Terms of Service "contain an arbitration clause," FAC ¶ 32, which provides that "any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services of Content (collectively 'Disputes') will be resolved **solely by binding, individual arbitration**," ECF No. 40-1 § 20(a); 2019 TOS § 20(a).

Although Plaintiffs acknowledge that they "agreed to resolve future disputes [with Peloton] in binding individual arbitration" ECF No. 21 at 2, they assert that their agreement to arbitrate cannot be enforced in this case. Plaintiffs note that Peloton's September 14, 2018 Terms of Service

provided that arbitration would be conducted by AAA.  *See* FAC ¶ 32; ECF No. 40-1 § 20(c).
Plaintiffs claim that in November 2019, AAA began to decline to accept future matters submitted
against or by Peloton and requested that Peloton remove AAA from its consumer arbitration
agreements.  FAC ¶ 33.  Plaintiffs allege that Peloton refused to remove AAA from its arbitration
agreements "[t]hrough at least December 23, 2019."  *Id.* ¶ 34.  And Plaintiffs assert that, as a result,
Peloton's arbitration clause is "invalid and unenforceable."  *Id.* ¶ 35.

Plaintiffs' claims about the state of affairs through "December 23, 2019" misses the mark.
Beginning with Peloton's December 27, 2019 Terms of Service, Peloton removed AAA from the
Terms' arbitration clause and specified that "[a]ny arbitration will be conducted by JAMS pursuant
to its Streamlined Arbitration Rules and Procedures."  2019 TOS § 20(d).  The updated Terms
further provide that "[i]f JAMS fails or declines to conduct the arbitration for any reason, we will
mutually select a different arbitration administrator.  If we cannot agree, a court will appoint a
different arbitration administrator."  *Id.*  Plaintiffs do not allege (nor could they) that JAMS is
unwilling or unable to arbitrate their claims, let alone that a different administrator could not be
appointed in that event.

The record firmly establishes that Ms. Skillern and the Litvins agreed to Peloton's updated
December 27, 2019 Terms, which included the revised arbitration clause.[10]  When rolling out its
updated December 27, 2019 Terms, Peloton notified U.S. members of those updated Terms via
their Bike, Tread, or App, and required each member to consent to the updated Terms in order to

---

[10]   Because a motion to compel arbitration is reviewed on a summary judgment-like standard
and parties are permitted to submit evidence, courts routinely find the existence of a valid
agreement to arbitrate based on a defendant's electronic records indicating a plaintiff's assent to
updated arbitration agreements. *See, e.g.*, *O'Callaghan v. Uber Corp. of Cal.*, 2018 WL 3302179,
at *7 (S.D.N.Y. July 5, 2018) ("Uber's electronic records show that O'Callaghan assented to four
updated agreements, each of which contains the arbitration provision.").

proceed and continue using Peloton's services.  *See* Feinberg Decl. ¶ 9.  Notably, Peloton members could not continue to use Peloton's services, including their Bike, Tread, or App unless and until they agreed to Peloton's updated December 27, 2019 Terms.  *See id.*[11]

Account records that Peloton maintains in the ordinary course of business identify the date on which each member, including Ms. Skillern and the Litvins, agreed to the December 27, 2019 Terms.  Feinberg Decl. ¶¶ 13, 17-18; *see also* FAC ¶ 68 ("On information and belief, Peloton records information concerning its customers and their subscriptions in its internal databases.").  As relevant here, Peloton's account records confirm that Ms. Skillern agreed to Peloton's December 27, 2019 Terms of Service on March 20, 2020 while using the Peloton Bike.  Feinberg Decl. ¶ 13 & Ex. F.  And Peloton's account records establish that Kathy and Michael Litvin agreed to Peloton's December 27, 2019 Terms of Service on June 6, 2020 and July 20, 2020, respectively, using Peloton's website or a mobile device, or the Peloton Bike.  *Id.* ¶¶ 17-18 & Ex. H.

The arbitration clause in Peloton's updated Terms of Service controls here.  The Litvins did not become Peloton members until summer 2020 and never agreed to the earlier, pre-December 2019 arbitration clause.  *Id.*  And Ms. Skillern did not bring her claim until over a year after she agreed to the updated Terms of Service.  Nor would it matter even if she could show that her claims predated the updated Terms.  It is settled law that absent an express limitation to "future disputes,"

---

[11]  Plaintiffs have argued that they are not bound by the updated arbitration clause in Peloton's December 27, 2019 Terms (and those that followed) because—they say—Peloton did not email them notice of the updated terms.  ECF No. 21 at 2.  But, as discussed below, because Plaintiffs expressly agreed to the December 27, 2019 Terms (*see* Feinberg Decl. ¶¶ 13, 15, 17-18), whether Peloton *also* notified Plaintiffs of the updated Terms via email and its website is of no moment.  Moreover, Peloton's records establish that Peloton *did* send notice of its updated December 27, 2019 Terms to the email addresses associated with Ms. Skillern's account and the Corken account.  *See* Olivo Decl. ¶¶ 6-8.  And, in any event, this argument has no bearing on the Litvins, who did not become Peloton members until June and July 2020, well after the updated arbitration clause was added to the Terms of Service.  *See* FAC ¶ 28.

a valid arbitration clause applies even to claims that predate its formation. *See, e.g.*, *Valle v. ATM Nat'l, LLC*, 2015 WL 413449, at *5 (S.D.N.Y. Jan. 30, 2015) ("The Second Circuit has held that arbitration clauses without an express limitation to 'future disputes' should be applied to preexisting claims." (citation omitted)); *Smith/Enron Cogeneration Ltd. P'ship*, *v. Smith Cogeneration Int'l, Inc*., 198 F.3d 88, 99 (2d Cir. 1999) (arbitration agreement without temporal limitation covers "actions predating the signing of the contract"); *Raymond v. Mid-Bronx Haulage Corp*., 2017 WL 9882601, at *4 (S.D.N.Y. June 10, 2017) ("[T]he Second Circuit generally presumes retroactive application of broad arbitration provisions absent explicit temporal limitations.").

Peloton's Terms of Service contain no explicit temporal limitation but broadly apply to "*any* dispute, claim or controversy arising out of or relating to these Terms or the breach . . . thereof." ECF No. 40-1 § 20(a) (emphasis added); 2019 TOS § 20(a).  Accordingly, the updated arbitration agreement controls Ms. Skillern's as well as the Litvins' claims. *See Williams v. Joseph Dillon & Co.*, 663 N.Y.S.2d 126, 126-27 (2d Dep't 1997) (by agreeing to arbitrate "any controversy," plaintiff agreed to arbitrate "all disputes," including those concerning transactions which occurred before agreement's execution); *Saizhang Guan v. Uber Techs., Inc.*, 236 F. Supp. 3d 711, 726-27 (E.D.N.Y. 2017) (same).

Peloton's Terms of Service also independently confirm that Peloton's updated Terms control here.  The September 14, 2018 Terms of Service that Ms. Skillern originally asserted that she "accepted and agreed to be bound by," ECF No. 1 ¶ 67—and which Plaintiffs still include as an exhibit to their operative FAC, *see* ECF No. 40-1—expressly provided that Peloton "may update these Terms at any time, in [its] sole discretion" and would make those updates available to Peloton members by posting them on Peloton's website and/or through the Peloton service.

ECF No. 40-1 § 25.  Peloton posted its December 27, 2019 Terms on its website when those terms took effect, *see* Feinberg Decl. ¶ 5, and Peloton's current Terms of Service are also posted on its website, *see Peloton Terms of Service*, Peloton, https://www.onepeloton.com/terms-of-service (last updated June 21, 2021).  Plaintiffs indisputably agreed that if they "continue[d] to use the Peloton Service after [Peloton] posted updated Terms, [Plaintiffs] are agreeing to be bound by the updated Terms."  ECF No. 40-1 § 25; 2019 TOS § 25 ("If you don't agree to be bound by the updated Terms, then . . . you may not use the Peloton Service anymore.").[12]  And Ms. Skillern admits that she continues to use Peloton's services today—over a year after Peloton updated its Terms of Service.  *See* FAC ¶¶ 26-28; *Saizhang Guan*, 236 F. Supp. 3d at 726 ("Courts applying New York law consistently have held that 'customers accept revised terms of their accounts by continuing to use their accounts after receiving the revised terms.'" (citation omitted)).

Accordingly, Ms. Skillern and the Litvins agreed to a valid arbitration agreement.[13]

### 2. Plaintiffs' Claims Fall Within The Scope Of The Arbitration Agreement And The Arbitrator Must Resolve Any Contrary Argument

Ms. Skillern's and the Litvins' claims also fall within the scope of the arbitration agreement.  The arbitration provision covers "any dispute . . . arising out of or relating to the[] Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of [Peloton's] Services or Content."  2019 TOS § 20(a).  Plaintiffs assert that Peloton breached its

---

[12]   When Peloton updates the arbitration provisions of its Terms of Service, as it did on December 27, 2019, it provides members with the opportunity to opt out from those changes by sending written notice to Peloton within 30 days of the date such change became effective.  *See* ECF No. 40-1 § 20(f).  Ms. Skillern does not allege that she opted out from the changes Peloton made to its arbitration clause when updating its Terms of Service on December 27, 2019.

[13]   Plaintiffs assume that AAA's purported unwillingness to conduct arbitrations involving Peloton would have rendered Peloton's September 14, 2018 arbitration agreement unenforceable while it was in force.  FAC ¶¶ 32-35.  Because Ms. Skillern agreed to Peloton's updated December 27, 2019 Terms of Service, this Court need not reach the question whether Ms. Skillern would have been obligated to arbitrate while the September 14, 2018 Terms remained controlling.

Terms of Service by charging sales tax "on a Peloton membership" that it was not authorized to charge, FAC ¶¶ 62-63, 69.   Plaintiffs further claim that this breach violated the consumer-protection statutes of several states.  *See id.* ¶¶ 80, 82-134.

Plaintiffs' own allegations thus confirm that their claims are covered by the arbitration provision.  They acknowledge that the Membership Terms "comprise part of Peloton's Terms of Service." *Id.* ¶ 5; *see also id.* ¶ 29.  By definition, a claim based on an alleged breach of "part of Peloton's Terms of Service," *id.* ¶ 5, is a claim "arising out of or relating to the[] Terms or the breach, termination, enforcement, interpretation or validity thereof," 2019 TOS § 20(a).  And each Peloton subscriber's obligation to pay sales tax itself arises from and relates to the Terms.  *See, e.g.*, FAC ¶ 88 (acknowledging that under "Peloton's Terms of Service, [sales tax] *had* to be paid on a recurring, monthly basis at the beginning of each monthly billing cycle in order for subscribers to maintain their Peloton Membership").  Ms. Skillern and the Litvins' claims thus "aris[e] out of or relat[e] to the[] Terms or . . . the use of [Peloton's] Services or Content."  2019 TOS § 20(a).  So "the dispute at issue comes within the scope of the arbitration agreement."  *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d at 128 (citing *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002)).  And, in any event, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25).

Even if there were a question about whether Ms. Skillern and the Litvins' claims fall within the scope of Peloton's arbitration agreement, the parties entrusted resolution of that dispute to the arbitrator.  The parties agreed that "the arbitrator shall have exclusive authority to decide all issues relating to the interpretation, applicability, enforceability and scope of th[e] arbitration agreement."  2019 TOS § 20(d).  As the Supreme Court has explained, "[w]hen the parties'

contract delegates the arbitrability question to an arbitrator, the courts must respect the parties'
decision as embodied in the contract." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S.
Ct. 524, 531 (2019).  Because the Terms clearly and unmistakably assign threshold questions of
arbitrability to the arbitrator, any dispute over whether Ms. Skillern or the Litvins' claims fall
within the scope of the arbitration agreement must be resolved by the arbitrator.

That result is further dictated by the parties' agreement that any arbitration shall be
governed by the JAMS Rules.  *See* 2019 TOS § 20(d).  Those Rules provide that "[j]urisdictional
and arbitrability disputes, including disputes over the formation, existence, validity, interpretation
or scope of the agreement under which Arbitration is sought, and who are proper Parties to the
Arbitration, shall be submitted to and ruled on by the Arbitrator," and that "[t]he Arbitrator has the
authority to determine jurisdiction and arbitrability issues as a preliminary matter." *Streamlined
Arbitration Rules & Procedures* at Rule 8(b), JAMS, https://www.jamsadr.com/rules-streamlined-
arbitration/#Rule-8 (effective June 1, 2021).  As the Second Circuit has explained, when parties
"explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the
incorporation serves as [further] clear and unmistakable evidence of the parties' intent to delegate
such issues to an arbitrator." *Contec Corp. v. Remote Sol. Co*., 398 F.3d 205, 208 (2d Cir. 2005)
(citing cases).  As such, although Ms. Skillern's and the Litvins claims inarguably fall within the
scope of the parties' arbitration agreement, any dispute should be resolved by the arbitrator.

### B.     Mr. Corken Is Likewise Required To Arbitrate His Claim

In Plaintiffs' original complaint, Mr. Corken alleged that he "accepted and agreed to be
bound by Peloton's Terms of Service, including its Membership Terms when [he] subscribed to
Peloton Membership subscriptions and used [his] Peloton Bike[]."  ECF No. 1 ¶ 67.  In addition,
Mr. Corken acknowledged that "[t]he Terms of Service, including the Membership Terms, is a
binding, enforceable contract between Peloton and Class members, including plaintiffs." *Id.* ¶ 68.

Plaintiffs doubled down on these assertions outside of the original complaint, representing that Mr. Corken, like Ms. Skillern, "initially agreed to resolve future disputes in binding individual arbitration under the September 14, 2018 Terms of Service [] in effect when they paid the membership subscriptions."  ECF 21 at 2.

In the FAC, however, Plaintiffs attempt to retreat from those admissions.[14]  Plaintiffs no longer appear to allege that Mr. Corken is a Peloton subscriber.  Instead they claim that "[i]n December 2019, plaintiff Ryan Corken purchased a Peloton Bike and began paying for his *wife's* All-Access Membership subscription" using a "credit or debit card on file with Peloton."  FAC ¶¶ 6, 27 (emphasis added); *see id.* ¶ 43 (alleging that Peloton improperly charged sales tax "on his wife's Peloton Membership every month," which Mr. Corken allegedly paid).

Assuming that it is Ms. Corken—not Mr. Corken—who was charged sales tax, it is hard to see how Mr. Corken has a claim at all.  But to the extent that he does, Mr. Corken is still obligated to arbitrate it.  Mr. Corken's claim is entirely premised on *Ms. Corken's* All-Access Membership.  And Peloton's records establish that, in the course of using that Membership, at minimum, Ms. Corken agreed to Peloton's December 27, 2019 Terms of Service—including the updated arbitration clause.  *See supra* at 7-8; Feinberg Decl. ¶ 15 & Ex. G.  Had Ms. Corken brought suit, rather than Mr. Corken, therefore, there is no question that she would be compelled to arbitrate her claim for the same reasons as every other Plaintiff.  *See supra* at 11-16.

The Corkens cannot avoid that result by bringing suit in Ryan's name rather than Sasha's.

---

[14]  This Court is not required to disregard Mr. Corken's original admissions.  *See, e.g.*, *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 32 F.2d 195, 198 (2d Cir. 1929 ("When a pleading is amended . . . it still remains as a statement once seriously made by an authorized agent, and as such it is competent evidence of the facts stated, though controvertible, like any other extrajudicial admission made by a party or his agent."); *Poindexter v. EMI Rec. Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012) ("even though the Amended Complaint is the operative pleading, the Court may still credit admissions in the original complaint and attached exhibits").

It is well settled that "non-signatories may be bound by arbitration agreements entered into by others" under several theories, including "assumption," "agency," and "estoppel." *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999); *see also Jefferies & Co. v. Infinity Equities I, LLC*, 887 N.Y.S.2d 81, 82 (1st Dep't 2009) ("A non-signatory may be bound to an arbitration agreement if so dictated by the ordinary principles of contract and agency."). For multiple reasons, such principles require Mr. Corken to arbitrate his claim here.

First, "[a] party is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from a contract containing an arbitration clause." *Am. Bureau of Shipping*, 170 F.3d at 353 (citation omitted). Here, Plaintiffs acknowledge that Peloton markets the "All-Access Membership" to which Ms. Corken subscribes, and for which Mr. Corken allegedly pays, as the "'most value-packed Peloton membership' because a single membership includes unlimited household profiles.'" FAC ¶ 23. In particular, Peloton's Membership Terms provide that "An All-Access Membership provides you *and members of your household* at one residential address (up to 20 user profiles) with full access to Peloton's available classes, content, and features on one Peloton Product from each Peloton Product category . . . plus access to the Peloton Apps, for as long as the All-Access Membership remains active." Feinberg Decl. Ex. I (emphasis added). The Litvins illustrate the point; because Mr. Litvin is "a member of the same household" as Ms. Litvin, he enjoyed the benefit of the option to create his own user name and access Peloton's services under Ms. Litvin's subscription "in accordance with Peloton's household pricing functionality." FAC ¶ 28. Because Mr. Corken received a similar benefit from his wife's agreement to Peloton's Terms of Service, he is estopped from denying his obligation to arbitrate under those Terms.

That is all the more so because Mr. Corken relies on the agreement containing the arbitration clause to press his claim. *See, e.g.*, *Mobile Real Estate, LLC v. NewPoint Media Grp.*,

LLC, 460 F. Supp. 3d 457, 479-80 (S.D.N.Y. 2020) (collecting cases for premise that "a non-signatory could be compelled to arbitrate when he brought suit seeking to enforce the agreement that contained the arbitration clause").  Here, although Plaintiffs now strategically omit Mr. Corken from those Plaintiffs alleging breach of contract, his claim is undeniably premised on Peloton's contractual promise to Ms. Corken that it would charge only applicable sales tax when charging her for her All-Access Membership.  *See, e.g.*, FAC ¶¶ 5, 60-61, 111-12.  Because Mr. Corken's claim is premised on the terms of Ms. Corken's agreement, and Peloton's purported misrepresentations and overcharges under that agreement, *see id.*; *see also id.* ¶¶ 107-20, Mr. Corken cannot avoid arbitrating under the arbitration clause applicable to disputes arising under that agreement.  *See, e.g.*, *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F. Supp. 293, 300 (S.D.N.Y. 1997) ("[W]hen a plaintiff who acquires rights under a contract as an agent, third-party beneficiary, or assignee subsequently 'bases [his] right to sue on the contract itself the provision requiring arbitration as a condition precedent to recovery must be observed.'" (citation omitted)).

Second, and relatedly, principles of equitable estoppel foreclose any effort by the Corkens to subvert Peloton's arbitration clause by bringing suit in Ryan's name.  "The indelible feature of estoppel, as it has been traditionally defined, is that one party has made a representation, upon which another party justifiably relies to their detriment, such that it would be inequitable for the first party to take a subsequent position inconsistent with the truth of that representation."  *Nicosia v. Amazon.com, Inc.*, 384 F. Supp. 3d 254, 273 (E.D.N.Y. 2019) (citing *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011)), *aff'd*, 815 F. App'x 612 (2d Cir. 2020).  In agreeing to Peloton's Terms of Service, Ms. Corken expressly "represent[ed] and warrant[ed]" that *she* "ha[d] the legal right to use all payment method(s) that [she] provide[d] to [Peloton]."  Feinberg Decl. 22 & Ex. I.  Because Mr. Corken admittedly transacted on his wife's behalf to

satisfy her contractual responsibilities to Peloton under her subscription account, he is "bound by the same terms and conditions previously agreed to by the account's true owner." *Nicosia.*, 384 F. Supp. 3d at 274. Application of equitable estoppel is necessary here, moreover, to avoid fundamental violence to contractual agreements between a company and its members; otherwise, "[a]ny individual could avoid the terms of a website by simply logging on to a friend's or relative's account instead of creating their own. Common sense dictates that this could not possibly be the rule; and where common sense goes, the law must follow." *Id.* at 272; *see also, e.g.*, *Lankford v. Orkin Exterminating Co.*, 597 S.E.2d 470 (Ga. Ct. App. 2004): *Wolff Motor Co. v. White*, 869 So. 2d 1129 (Ala. 2003).

Finally, agency principles lead to the same result. In making payment on Ms. Corken's behalf, Mr. Corken acted as Ms. Corken's agent, fulfilling *her* responsibility to make payment on *her* account, using funds that she warranted and represented that *she* "ha[d] the legal right to use." Feinberg Decl. ¶ 22 & Ex. I. Because she is bound by her agreement to arbitrate, so is Mr. Corken. *See, e.g.*, *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121 (3d Cir. 1993) ("Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements."). For all those reasons, Mr. Corken is no less bound to arbitrate his claim than would be Ms. Corken.

### C.      Because All Of Plaintiffs' Claims Are Subject To Arbitration, This Court Should Dismiss The Complaint

The FAA directs the district court, "on application of one of the parties," to enter a stay in a case where the asserted claims are "referable to arbitration." 9 U.S.C. § 3; *see also Shearson/Am. Exp., Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *NPS Commc'ns, Inc. v. Cont'l Grp.*, 760 F.2d 463, 465 (2d Cir. 1985). However, "[w]here all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings." *Arrigo v.*

*Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 305 (S.D.N.Y. 2010) (quoting *Spencer-Franklin v. Citigroup/Citibank N.A.*, 2007 WL 521295, at *4, 11 (S.D.N.Y. Feb. 21, 2007)). Because all of Plaintiffs' claims are subject to arbitration, this Court should grant Peloton's motion to compel arbitration and dismiss this action.[15]

## II.   ALTERNATIVELY, THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS

### A.   Because Peloton Members Waive The Right To Bring A Class Action, This Court Cannot And Should Not Exercise Federal Jurisdiction

If this Court declines for any reason to grant Peloton's motion to compel arbitration, it should dismiss Plaintiffs' claims for lack of jurisdiction. Although Plaintiffs seek to invoke this Court's jurisdiction on the basis of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA"), FAC ¶ 17, their own complaint establishes that parties bound by Peloton's Terms of Service waived the right to bring a class action against Peloton. Because Plaintiffs do not allege that their individual claims establish subject-matter jurisdiction, this action does not belong in federal court.

Plaintiffs assert that jurisdiction is proper under CAFA "because this is a class action in which at least one member of the class is a citizen of a state different from defendant, the amount in controversy exceeds $5 million, exclusive of interest and costs, and the proposed class contains more than 100 members." FAC ¶ 17. Parties subject to Peloton's Terms of Service, however,

---

[15]   At the November 2, 2021 pre-motion conference, Plaintiffs argued that Peloton's decision to litigate against *other* Peloton members in *another* case means that Peloton has waived its right to invoke the arbitration provision in *this* case. That is wrong. *See, e.g.*, *Doctor's Assocs. v. Stuart*, 85 F.3d 975, 982 (2d Cir. 1996) ("Defendants cannot rely on the fact that [the movant] has brought eviction proceedings against other franchisees as a basis for [the movant's] waiver of its contractual right to arbitrate in this case."). Moreover, it is for the arbitrator—not this Court—to decide that waiver defense. *See, e.g.*, *Bell v. Cendant Corp.*, 293 F.3d 563, 569-70 (2d Cir. 2002) (plaintiff's argument that defendant "waived its right to arbitrate" by litigating separate suit was "properly left for the arbitrator"). In any event, actions taken by Peloton under an older version of its Terms of Service have no bearing on the enforceability of an arbitration clause in a different contract—namely the updated Terms of Service to which Plaintiffs agreed.

expressly waive the right to bring a class action.  Even the outdated September 14, 2018 Terms of Service that Plaintiffs attach to their FAC provide in bold and capitalized text:

> **YOU AND PELOTON AGREE THAT EACH OF US MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

ECF No. 40-1 § 20(e).[16]  Peloton's December 27, 2019 Terms of Service continue to contain the same provision.  *See* 2019 TOS §§ 20, 20(f).  And it is settled that such class-action waivers are enforceable under New York law.  *See, e.g.*, *Gold v. N.Y. Life Ins.*, 141 N.Y.S.3d 697 (1st Dep't 2021); *Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (1st Dep't 2004) (citing cases); *Ranieri v. Bell Atl. Mobile*, 759 N.Y.S.2d 448, 449 (1st Dep't 2003) ("a contractual proscription against class actions, such as contained in the Agreements, is neither unconscionable nor violative of public policy" (citing cases)).  Courts routinely enforce class-action waivers in the context of a motion to dismiss or to compel arbitration.  *See, e.g.*, *Horton v. Dow Jones & Co.*, 2019 WL 952314, at *2 (S.D.N.Y. Feb. 27, 2019), *aff'd*, 804 F. App'x 81 (2d Cir. 2020) ("[T]he parties' Class Waiver bars the putative class claim asserted in the Complaint both in arbitration and in court"); *Camilo v. Uber Techs., Inc.*, 2018 WL 2464507, at *3 (S.D.N.Y. May 31, 2018).  This Court should do so here.  Because CAFA is the only asserted basis for federal jurisdiction, *see* FAC ¶ 17, and Plaintiffs' own complaint establishes that they cannot invoke this Court's

---

[16]  "On a motion to dismiss, a court may consider facts stated in the complaint, any documents attached to the complaint, and any documents incorporated by reference into the complaint." *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 318 (S.D.N.Y. 2012) (citing *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2nd Cir. 2005)).  Where plaintiffs bring a claim for breach of contract, as here, the complaint "is deemed to incorporate the alleged contract by reference because the alleged contract is integral to the claim."  *Id.* (citation omitted).  So the Court may consider Peloton's Terms of Service in adjudicating Peloton's motion to dismiss.

jurisdiction on that basis, this Court should dismiss Plaintiffs' complaint for lack of subject matter jurisdiction, *see, e.g.*, *Román v. Spirit Airlines*, 482 F. Supp. 3d 1304, 1316 (S.D. Fla. 2020).

Certain courts, upon finding that CAFA originally afforded them subject-matter jurisdiction, have proceeded upon dismissing a plaintiff's class claims to consider whether to exercise supplemental jurisdiction over a plaintiff's individual state law claims.  It is true that "*if jurisdiction exists at the time an action is commenced*, such jurisdiction may not be divested by subsequent events." *F5 Capital v. Pappas*, 856 F.3d 61, 76 (2d Cir. 2017) (emphasis added) (quoting *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991) (per curiam)). Here, however, owing to Plaintiffs' class-action waiver, jurisdiction never existed *ab initio*. Accordingly, the most appropriate course is to dismiss for lack or jurisdiction.

Even if this Court believed it had the power to exercise supplemental jurisdiction over Plaintiffs' individual claims, it should not do so.  Owing to sound principals of federalism and judicial economy, courts regularly dismiss supplemental claims once class claims are struck, rather than retain jurisdiction of such small state-law claims in federal court.  *See, e.g.*, *Horton*, 2019 WL 952314, at *3-4 (declining supplemental jurisdiction over state-law claims once class claims were struck), *aff'd*, 804 F. App'x at 85 ("[W]e agree with the district court's decision not to exercise jurisdiction over Horton's individual state-law claim after it concluded that Horton could not proceed on a class basis"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988) ("When the single federal-law claim in the action was eliminated at an early stage of the litigation, the District Court had a powerful reason to choose not to continue to exercise jurisdiction."); *Weber v. Quest Diagnostics of Pa., Inc.*, 2020 WL 6372382, at *6 (W.D.N.Y. Oct. 29, 2020).  This accords with the Supreme Court's guidance that "'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise

jurisdiction over the remaining state-law claims.'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7); *see also Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017) (Calabresi, J., concurring) ("[O]ur circuit takes a very strong position that state issues should be decided by state courts."). The prudential argument for dismissal is even stronger here in light of the "[m]ore embracive" considerations of comity dictating that federal courts should refrain from hearing "claims for relief that risk disrupting state tax administration." *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 417 (2010) (citation omitted); *see infra* Section II.B.1.

Because Plaintiffs' class-action waiver deprives this Court of jurisdiction, it should dismiss this matter for lack of jurisdiction. In the alternative, it should decline to exercise supplemental jurisdiction over Plaintiffs' individual state law claims and dismiss this action.

**B.   Plaintiffs Also Fail To State Claims On Which Relief Can Be Granted**

Even if Plaintiffs could overcome all the above hurdles, dismissal would still be proper.

### 1.   The Tax Injunction Act And Related Comity Doctrine Bar Plaintiffs' Claims

"Federal courts generally abstain from cases that challenge state taxation schemes on the basis that those claims are more appropriately resolved in state court." *Joseph v. Hyman*, 659 F.3d 215, 218 (2d Cir. 2011) (citing cases). Under the Tax Injunction Act, 28 U.S.C. § 1341 ("TIA"), and the related and "more embracive" comity doctrine, *Levin*, 560 U.S. at 423-24, "federal courts are precluded from exercising jurisdiction over challenges to state tax assessments, regardless of the type of relief sought," *Bernard v. Village of Spring Valley*, 30 F.3d 294, 297 (2d Cir. 1994).

The TIA specifies that federal courts may not "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. Although the TIA directly bars claims for

declaratory and injunctive relief, the comity doctrine bars similar claims for damages that "'risk disrupting state tax administration' if 'an adequate, speedy, and efficient remedy exists in state court.'" *Dorce v. City of New York*, 2 F.4th 82, 98 (2d Cir. 2021) (citation omitted).

In this case, Plaintiffs seek to challenge the assessment and collection of state taxes, and to recover those taxes that they allege were improperly taken from them.  But the TIA and the related comity doctrine bar such claims in federal court.  It makes no difference that Plaintiffs here sued a merchant rather than a state, or style their claims as seeking "damages" rather than "refunds." *See, e.g.*, *Gwozdz v. HealthPort Techs., LLC*, 846 F.3d 738, 740 (4th Cir. 2017) (applying the comity doctrine to bar damages claim against vendor where "[i]nstead of requesting a refund . . . [the] complaint asserts several statutory consumer protection claims"); *Fredrickson v. Starbucks Corp.*, 840 F.3d 1119, 1124-25 (9th Cir. 2016) (comity doctrine barred damages suit against merchant that would have required court to find that merchant's tax withholding conflicted with state tax law).  The reason for those results is straightforward:  "A claim for damages against vendors in the performance of their tax collection duties has precisely the same potential as a claim for equitable relief to disrupt a state's entire system of revenue collection."  *Gwozdz*, 846 F.3d at 743; *see also Fredrickson*, 840 F.3d at 1124 (noting that such claims would affect "the flow of tax revenue into [a state's] coffers").

Efficient state-law remedies permit Plaintiffs to challenge Peloton's collection of sales tax and pursue the recovery of any alleged overpayment.  *See infra* Sections II.B.2-.4.  As such, this Court should abstain from hearing Plaintiffs' claims, which unnecessarily invite this Court to resolve unsettled state tax issues better addressed in the first instance by those states, and threaten to interfere with the flow of revenue into those states' coffers not only from Peloton's customers, but those of countless other merchants impacted by the sales-tax provisions at issue.

27

2.     **Plaintiffs' New York Claims Should Be Dismissed For Failure To Exhaust Administrative Remedies**

Alternatively, Plaintiffs' New York claims should be dismissed for failure to exhaust administrative remedies.  Plaintiffs, in part, seek relief on behalf of a putative class of New York taxpayers on the theory that Peloton collected sales tax that allegedly is inapplicable to digital goods under state law.  But under New York's tax laws, such claims must be brought by seeking a refund via the New York Department of Taxation, using the administrative procedures set forth in New York Tax Law section 1139.  Because that procedure is the exclusive remedy available to Plaintiffs under state law, Plaintiffs' third claim for relief—under the New York General Business Law—as well as any other claims premised on the payment of New York sales tax, should be dismissed for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1).[17]

New York Tax Law § 1139(a) states that a consumer who seeks the return of sales tax "erroneously, illegally or unconstitutionally collected or paid . . . to a person required to collect tax" must apply for a refund to the state tax commission.  The Second Circuit has held that this "refund process is the 'exclusive remed[y] available to any person for the review of tax liability imposed' under state sales tax law, and no 'determination or proposed determination of tax or determination on any application for refund shall be enjoined or reviewed . . . by any action or proceeding other than a proceeding under article seventy-eight of the [New York] civil practice law and rules.'" *Estler v. Dunkin' Brands, Inc.*, 691 F. App'x 3, 5 (2d Cir. 2017) (alterations in

---

[17]   "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *see also*, *Louis v. Comm'r of Soc. Sec.*, 2010 WL 743939, at *3 (S.D.N.Y. Mar. 2, 2010) (federal court lacked subject-matter jurisdiction due to plaintiff's failure to exhaust administrative remedies).  While Plaintiffs' failure to exhaust administrative remedies is a jurisdictional issue properly brought under Rule 12(b)(1), Peloton alternatively moves under Rule 12(b)(6) for the same reason.

original) (quoting N.Y. Tax Law § 1140).  This is because the "collection of sales taxes constitutes merely a ministerial act," so, once the merchant collects the tax, its "responsibility ends" and "a dissatisfied taxpayer's recourse is against the taxing body."  *Kupferstein v. TJX Cos.*, 2017 WL 590324, at *2 (E.D.N.Y. Feb. 14, 2017) (plaintiff could not avoid section 1139 by characterizing her claim as one under New York General Business Law section 349) (internal alterations and quotation marks omitted).

In *Guterman v. Costco Wholesale Corp.*, 927 F.3d 67 (2d Cir. 2019), the Second Circuit faced a case similar to this one.  There, the plaintiff also alleged that he was unlawfully charged sales tax under New York law and brought suit in federal court instead of seeking a refund under section 1139.  The court held that section 1139's application-and-refund process is the exclusive remedy for claims of unlawfully charged sales tax.  *Id.* at 69-70.  And the court held that the plaintiff "cannot make an end run around [this] exclusive remedy . . . by presenting the improper collection of sales tax as a claim under [New York's GBL] § 349."  *Id.* at 70; *see also Cohen v. Hertz Corp.*, 2013 WL 9450421, at *3 (S.D.N.Y. Nov. 26, 2013) ("The administrative refund remedy provided by section 1139 for sales tax overcharge claims is an exclusive one."); *Gilbert v. Home Depot*, 2014 WL 4923107, at *4 (W.D.N.Y. Sept. 30, 2014) ("[T]he question of whether a vendor is collecting and remitting sales taxes in accordance with state law is a question that has been entrusted to the Department of Taxation . . . Plaintiff cannot, as a matter of law, maintain this action alleging [the vendor] improperly charged sales tax on a nontaxable item."); *Davidson v. Rochester Tel. Corp.*, 558 N.Y.S.2d 1009, 1011 (3d Dep't 1990) (similar).

Plaintiffs do not allege that they have sought administrative relief under section 1139.  They seek to sidestep its requirements by claiming (inaccurately) that Peloton has not remitted the collected sales tax to the New York Department of Taxation.  FAC ¶ 101.  In *Togut v. Forever 21,*

*Inc.*, 285 F. Supp. 3d 643 (S.D.N.Y. 2018), the court rejected a similarly transparent attempt to avoid section 1139.  As the court explained, conclusory allegations that "Defendants have not remitted the collected monies to the Department" do not render section 1139 inapplicable, nor even justify jurisdictional discovery, particularly given that a plaintiff can resolve whether the defendant remitted her sales tax to New York simply by filing a Form AU-11 Application for Credit or Refund of Sales or Use Tax.  *Id.* at 647-48.  Other courts have reached similar results.  *See Kupferstein*, 2017 WL 590324, at *3 (allegation that defendant failed to remit full amount plaintiff paid in taxes was speculation insufficient to support her claim).

The sole basis upon which Plaintiffs seem to rest their claim that Peloton did not remit the collected sales taxes is that Peloton recorded on its balance sheets an accrued expense corresponding to roughly $5 million a year for 2018 and 2019 for "potential sales tax liability associated with its subscription fees."  FAC ¶ 57 (quoting Peloton Interactive, Inc., Registration Statement (Form S-1) at F-24 (Aug. 27, 2019), https://investor.onepeloton.com/node/6261/html ("Registration Statement")).  But on page 32 of that form, Peloton specifically notes that the accrued expense reflects a contingency for potential ***additional*** taxes and liabilities—not for taxes that it actually collected.  And in any event, the accrued liability makes no reference to New York or any other state.  In other words, the contingency is a general reserve in the event that Peloton *undercollected* taxes in any state, not a liability premised on overcollecting tax in New York or any other state.[18]  The same form explains that "[s]ales tax collected from customers and remitted to governmental authorities is not included in revenue and is reflected as a liability on the balance

---

[18]   Plaintiffs confusingly try to make something of the fact that Peloton's SEC filings do not indicate that the reserve it has set aside for "potential sales tax liability" has been remitted to states. FAC ¶ 58.  Of course not.  The reserve is a contingency in the event that Peloton determines that it *undercollected* sales tax from its members; it does not involve collected sales tax at all.

sheet."  Registration Statement at F-9.

Plaintiffs' conclusory claim that Peloton failed to remit taxes is therefore no more founded than those claims rejected in *Togut* and *Kupferstein*.  As in those cases, Plaintiffs could have, but failed, to file the Form AU-11 that might have established otherwise.  And as in those cases, Plaintiffs' failure to exhaust administrative remedies requires dismissal of any claims under New York law or premised on the payment of New York taxes.

### 3.     Plaintiffs' Massachusetts Claim Must Be Dismissed For Failure To Exhaust Administrative Remedies And Failure To State A Claim

The Court should also dismiss Plaintiffs' claims under Massachusetts law due to Plaintiffs' failure to exhaust administrative remedies and their failure to state an actionable claim under Massachusetts's Consumer Protection Law, Mass. Gen. Laws ch. 93A, §§ 2, 9.

### a.     Plaintiffs Have Not Alleged That They Filed Claims For Refunds In Massachusetts

Massachusetts lays out the procedure for requesting a refund of inappropriately collected taxes in Mass. Gen. Laws ch. 62C, § 37 as follows:

> *Any person* aggrieved by the assessment of a tax, other than a tax assessed under chapter 65 or 65A [concerning the taxation of legacies and estates], may apply in writing to the commissioner, on a form approved by the commissioner, for an abatement thereof at any time: (1) within 3 years from the date of filing of the return . . . or (3) within 1 year from the date that the tax was paid, whichever is later . . . .

(emphasis added).  Those "procedures 'are exclusive, absent exceptional circumstances' . . . [and] [e]xhaustion is generally required unless the administrative remedy is seriously inadequate, the issue at stake is important, novel, or recurrent, the decision has public significance affecting many taxpayers or the case is reduced purely to a question of law."  *Leger v. Adams*, 1994 WL 879587, at *2 (Mass. Super. Ct. July 15, 1994), *aff'd sub nom*. *Leger v. Comm'r of Revenue*, 654 N.E.2d 927 (Mass. 1995).  While courts have discretion to hear such claims, doing so is generally

disfavored. *Gen. Dynamics Corp. v. Bd. of Assessors of Quincy*, 444 N.E.2d 1266, 1270 (Mass. 1983) ("[W]e look with disfavor on the Superior Court's exercising jurisdiction over [tax matters].").

In a case factually similar to the one here, consumers who purchased items at Home Depot with coupons alleged that Home Depot improperly charged them sales tax on the pre-discounted purchase price, and that such overcharges constituted an unfair or deceptive practice in violation of Mass. Gen. Laws ch. 93A. *McGonagle v. Home Depot U.S.A., Inc.*, 915 N.E.2d 1083 (Mass. 2009). The Massachusetts Appellate Court affirmed a ruling from the Massachusetts Superior Court granting a motion for summary judgment on behalf of Home Depot. The court explained that statutes and regulations administered by the Massachusetts Department of Revenue "afford an aggrieved sales tax payer primary recourse potentially inconsistent with c[h]. 93A remedies." *Id.* The court explained:

> A person seeking refund of an overpayment . . . may apply for an abatement within two years of the payment of the tax. Interest on the refund will depend on a Federal short-term rate, typically far below the rate of twelve percent authorized for compensatory damages by Massachusetts law. The remedies provided for refund "shall be exclusive, whether or not the tax is wholly illegal." These restrictive provisions reflect the Commonwealth's reliance on, and desired preservation of, taxes once collected.

*Id.* at 602 (internal citations omitted). So any claim premised on the overpayment of Massachusetts tax should be dismissed for failure to follow state procedure.

### b.    Plaintiffs Have Not Stated An Actionable Claim Under Massachusetts's Consumer Protection Law

To state a claim under Massachusetts's Consumer Protection Law ("MCPL"), Mass. Gen. Laws ch. 93A, a plaintiff's allegations "must illustrate something beyond a mere good faith dispute, failure to pay, or simple breach of contract." *Woods v. Wells Fargo Bank, N.A.*, 733 F.3d 349, 358 (1st Cir. 2013); *see also Juarez v. Select Portfolio Servicing, Inc.*, 708 F.3d 269, 280 (1st

Cir. 2013) ("good faith disputes over billing, simple breaches of contract, or failures to pay invoices, for example, do not constitute violations of Chapter 93A"); *Duclersaint v. Fed. Nat. Mortg. Ass'n*, 696 N.E.2d 536, 540 (Mass. 1998) ("a good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c[h]. 93A claim is made"). Specifically, a plaintiff must allege conduct of an "extortionate quality . . . of unfairness" or deceptiveness. *Atkinson v. Rosenthal*, 598 N.E.2d 666, 670 (Mass. App. Ct. 1992). "In the absence of conduct having that quality," a breach of contract—"even though deliberate and for reasons of self-interest"—"does not present an occasion for invocation of c[h]. 93A remedies." *Id.* at 670-71; *see also Whitinsville Plaza, Inc. v. Kotseas*, 390 N.E.2d 243, 251 (Mass. 1979).

Plaintiffs' MCPL claim fails under this standard. Although their FAC repeatedly uses the buzzwords "unfair or deceptive" (¶¶ 110, 117, 119), they do not actually allege *facts* to substantiate those conclusory labels. To the contrary, Plaintiffs admit that Peloton was open about all of the conduct about which they complain: Plaintiffs admit that Massachusetts subscribers were told "Peloton Memberships cost $39 or $12.99 per month plus applicable taxes" and were told that "they were being charged a sales tax on top of the base monthly Peloton Membership fee." FAC ¶ 111 (emphasis omitted). In other words, Plaintiffs admit that Peloton "disclosed the actual pre-tax price . . . and the actual amount of sales tax collected in connection with each transaction." *McLean v. Big Lots Inc.*, 2021 WL 2317417, at *5 (W.D. Pa. June 7, 2021) (discussing, *inter alia*, Massachusetts's consumer-protection statute). That means Peloton's conduct "cannot be considered deceptive." *Id.*

At bottom, Plaintiffs' MCPL claim is just a restated version of their breach-of-contract claim. *Compare, e.g.*, FAC ¶ 80 ("Peloton charged an *inapplicable* tax that plaintiffs and the Breach of Contract Class did not agree to pay."), *with id.* ¶ 110 ("Peloton systematically

overcharged—and actually collected from—consumers additional monies on top of the monthly subscription fee under the guise of a sales tax"). That claim is the kind of "mere good faith dispute, failure to pay, or simple breach of contract" that cannot support liability under the MCPL. *Woods*, 733 F.3d at 358 (citation omitted).[19]

### 4. Plaintiffs' Virginia Claims Should Be Dismissed For Failure To Notify Peloton Before Bringing Suit

Slightly different rules apply in Virginia, but the Virginia Communications Sales and Use Tax provisions also preclude a party from filing suit until administrative remedies have been exhausted. Plaintiffs allege that Virginia excludes from taxation "digital products delivered electronically." FAC ¶ 40 & n.30 (citing Va. Code Ann. § 58.1-648(C)). But the relevant statute specifically sets forth "Customer remedy procedures for billing errors" as follows:

> If a customer believes that an amount of tax, or an assignment of place of primary use or taxing jurisdiction included on a billing is erroneous, the customer shall notify the communications service provider in writing. . . . If [the provider's] review shows that the amount of tax or assignment of place of primary use or taxing jurisdiction is in error, the [provider] shall correct the error and refund or credit the amount of tax erroneously collected from the customer for a period of up to two years. . . . The procedures in this section shall be the first course of remedy available to customers seeking correction of assignment of place of primary use or taxing

---

[19] The Massachusetts Supreme Judicial Court has made clear that a defendant's allegedly erroneous collection and remittance of sales tax to the Commonwealth is not actionable under the MCPL. *See Feeney v. Dell Inc.*, 908 N.E.2d 753, 770-71 & n.37 (Mass. 2009). In dicta, the court acknowledged that a defendant who falsely charged a tax and retained the funds collected for its own profit could be subject to an action under the MCPL. *See id.* Plaintiffs do assert that Peloton did not remit collected sales tax to Massachusetts or any taxing authority. FAC ¶ 110-11. But that conclusory assertion is not plausible. *See, e.g., Togut*, 285 F. Supp. 3d at 647-48; *Kupferstein*, 2017 WL 590324, at *3. Moreover, that assertion is expressly refuted by allegations in Plaintiffs' own FAC, quoting language in Peloton's SEC Filings affirming that "[s]ales tax [is] collected from customers *and remitted to governmental authorities*." FAC ¶ 58 (emphasis added) (citation omitted). Even if Plaintiffs' contrary conclusory allegations were sufficient to defeat a motion to dismiss, Mr. Corken's claim will fail as a matter of law—because Peloton *did* remit the collected sales tax to the Massachusetts Department of Revenue.

> jurisdiction, or a refund of or other compensation for taxes erroneously collected by the [provider], and **no cause of action based upon a dispute arising from such taxes shall accrue until a customer has reasonably exercised the rights and procedures set forth in this subsection**.

Va. Code Ann. § 58.1-652 (emphasis added).  Because Skillern did not comply with this requirement before filing suit,[20] she cannot pursue any claims premised on the overpayment of a Virginia tax in this case.

## CONCLUSION

For the foregoing reasons, Peloton's motion to compel arbitration should be granted.  In the alternative, Peloton's motion to dismiss should be granted with prejudice.

Dated:  January 11, 2022

Respectfully submitted,

*/s/ Steven N. Feldman*
Steven N. Feldman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Phone:  (212) 906-1200
Fax:      (212) 751-4864
Email:   steve.feldman@lw.com

Jean A. Pawlow (admitted *pro hac vice*)
Michael E. Bern (admitted *pro hac vice*)
Gregory B. in den Berken (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
Phone:  (202) 637-2200
Fax:      (202) 637-2201
Email:   jean.pawlow@lw.com
            michael.bern@lw.com
            greg.indenberken@lw.com

---

[20]   After Peloton filed its pre-motion conference letter, Skillern sent a letter to Peloton purporting to invoke Va. Code Ann. § 58.1-652 and requesting a refund of Virginia tax.  Because Skillern failed to do so before bringing suit, her cause of action never accrued.

William J. Trach (admitted *pro hac vice*)
LATHAM & WATKINS LLP
200 Clarendon Street
Boston, MA 02116
Phone:   (617) 948-6000
Fax:       (617) 948-6001
Email:    william.trach@lw.com

*Counsel for Defendant Peloton Interactive, Inc.*